IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RAJET AEROSERVICIOS S.A. DE C.V., | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | Case No.: 4:18-CV-4441 |
| | § | |
| LUIS CARLOS CASTILLO CERVANTES, | § | |
| *Defendant* | § | |

## AFFIDAVIT OF LUIS ALFREDO RAYET DIAZ

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct:

1. My name is Luis Alfredo Rayet Diaz. I am over the age of 21 years and competent to testify to the matters set out in this affidavit. I have personal knowledge of the facts set out in this affidavit and those facts are true and correct.

2. I am the President and Owner of Rajet Aeroservicios S.A. de C.V.

3. I currently reside in Saltillo, Mexico.

4. From 2009-2012, my family and I lived in the United States, first in Conroe, Texas and later in San Antonio. Both my children attended school in Texas.

5. I speak, read, and write English and Spanish.

6. Rajet Aeroservicios S.A. de C.V. is a provider of air charter services. Our clients include both individuals and companies. Approximately 20% of our clients would fly between Mexico and the United States. All of our planes have been purchased in the United States. Some have Mexican tail numbers, and some have had U.S. tail numbers. We comply with both U.S. and Mexican regulations. We have U.S. insurance and maintenance contracts, among others.

7. As a charter operator ("fletante"), we do not sell tickets or enter contracts with passengers. Our customers ("fletadors") charter planes under charter agreements ("contractos de fletamente").

8. When a new customer requests a charter flight, we require advance payment. This is standard for all our corporate customers. For an individual customer, we might bill the customer and accept payment after the service is provided. This is common but it depends on the relationship with the customer. Apart from invoices, we do not require customers to enter standard purchase agreements. We maintain expense reports for each flight which identify the pilot and passenger or party that is traveling. These reports are only for our internal accounting and not provided to customers, passengers, or anyone else.

9. Luis Castillo has chartered hundreds of flights from us since 2002.[1]

10. All of our charter agreements were oral agreements entered between myself and Castillo. We sent him invoices for these flights by email. We do not have letters or other paper documents regarding these agreements.

11. I first met Mr. Castillo in 2002. He called me and said someone had recommended me. He said he was in McAllen, Texas and wanted to fly to Mexico City.

12. Some months later, I visited him in person at his office at the Inter National Bank building in McAllen. He also owned a business called Rodmax, named after his sons Rodrigo and Maximiliano. There was a sign for Rodmax. He never mentioned Lucamax. He described his office as "my" office and "my" business. He had approximately 8 employees at his office.

13. Approximately 4-5 months after Castillo purchased his first flight, he requested a flight without paying in advance, and I agreed to invoice him afterwards. He asked if I could bill

---

[1] When preparing my affidavit of November 20, 2018, I believed that Rajet first flew Castillo in 2005. After reviewing more records with my lawyer, I now remember the commercial relationship began in 2002, not 2005.

to certain companies and said, "it is me paying for it." This was an essential condition. I would never have provided a flight without advance payment unless it was with his personal assurance that he would be paying for it. In the beginning, he never failed to pay promptly.

14.     Some months later, I visited him at his office in McAllen and he asked me to open a bank account in the United States which would make it easier for him to pay me for future flights. He introduced me to the President and Vice President of the bank. He described himself as a part owner of the bank but did not work for the bank. Over the years, he sent me a significant number of payments to this U.S. account from U.S. accounts associated with his U.S. based businesses.

15.     I also visited him at his house which was located in a golf club. Later, I visited him at a new house. During construction of that house, he had suffered a spinal accident and undergone treatment in Houston. In his house, he showed me a photo of him with U.S. President George W. Bush and the mayor of Mission, Texas.

16.     In 2004, we formed a plane business in McAllen called Maxray for which we purchased planes in the U.S. Later Castillo purchased one of the planes in his own name. He had U.S. lawyers prepare the documents for Maxray.

17.     In total, I visited him in McAllen approximately 100 times. We developed a close relationship in which I trusted him to pay for all of his flights. His sons, who were approximately 7-9 years old, referred to me as "uncle." In 2014, the son ordered a plane from us, which I understood to be related to family business. His sons went to local schools and spoke perfect English.

18.     He completed the home where he lives in Mission, Texas in 2005 and it was worth over $10,000,000.00 when it was complete. Over the years, he has had many Mexican and Texas Politicians to his home in Mission, Texas, including U.S. Department of Energy Secretary Rick

Perry, who was governor of Texas at the time he built the home. He has a long history of supporting Texas politicians, including U.S. Senator John Cornyn, U.S. Representative. Rubén Hinojosa, former U.S. Representative Ciro Rodriguez, along with many more local politicians.

19. I know that he owns a great deal of land in and around Mission, Texas. He has also developed a lot of the land in the area and made substantial money as a developer in Texas.

20. I know that the money he does make in Mexico is a direct result of having an exclusive license to sell a United States built product. And most, if not all, of the money he earns in Mexico is brought back to Texas. As far as I know, he does not have any assets in Mexico.

21. The flights at issue in this case were negotiated over the phone in 2014. In this phone call, which is recorded, Castillo called me from the United States. With him, Castillo had two U.S. witnesses that live and work in the U.S. One of the conditions that he negotiated was for me to provide a plane that was capable of traveling to McAllen, Texas. On this call, we agreed to a price per hour of the flights and for the plane to be used, which was capable of traveling to Texas. The price was our regular rate which we had been charging him.

22. This agreement was between my company and Castillo personally. I did not communicate with anyone else regarding this agreement. I did not authorize anyone to communicate with him regarding the agreement. No employee of our company would ever speak to him or his passengers regarding the terms of the agreement. I never entered any agreement with any of the passengers on these flights. I did not agree to provide the flights without full payment. I was never asked to do that, and I never offered.

23. No agreement was made with one of Castillo's many companies. I know that Castillo owns or controls many companies, and a majority of those companies are shell companies formed for tax liability purposes. I would not have entered this agreement with Castillo if he was

doing so on behalf of one of his many companies. He made it clear to me that he was personally entering in to this agreement. In deciding whether to enter in to this agreement, I took in to consideration Castillo's significant wealth in Texas, and the many assets he owned and controlled there. I do not believe that any of his Mexican companies own assets in Mexico, and I would not have entered an agreement unless it was between Rajet and Castillo personally.

24. The following is a list of all the companies that I am aware of that are or were owned or controlled by Castillo:

a. Castillo Generations I, L.P.

b. Castillo Generations, LLC

c. Drag Oil, LLC

d. Dri Max Repaving International, Inc.

e. Imperial Air, L.P.

f. L&M Castillo, L.L.C.

g. L.C. Castillo, Inc.

h. Luis & Maria Castillo, L.P.

i. Lumax GP, LLC

j. Lumax, LLP

k. Malvasia, Inc.

l. Maxray, L.P.

m. Municipal Trucks and Equipment, Inc.

n. Rodmax Group Management, LLC

o. Rodmax Group, L.P.

p. Rodmax, Inc.

      q. Turbo Commander, LLC

      r. Lucamax, S.A. de C.V.

      s. Impulsora Internacional de Equipos, S.A. de C.V.

      t. Operadora Mistli, S.A. de C.V.

      u. Creator Avalanzed, S.A. de C.V.

      v. Cofnymex, S.A. de C.V.

      w. Plasmon, S.A. de C.V.

      x. Medicline Equipos Medicos, S.A. de C.V.

      y. Impulsora Mexicana de Comercio y Construcción, S.A. de C.V.

      z. Impulsora Internacional de Equipos, S.A. de C.V.

      aa. Multiservicios Immex, S.A. de C.V.

      bb. Insumos y Maquinaria para la Fundición S.A. de C.V

25. As was consistent with our prior agreements, I agreed to send Castillo's assistant invoices for payments he made to any of the many shell companies that Castillo chose. In the past, prior to the flights at issue in this case, we had received payments from Castillo that were paid through his Texas-based corporation, Rodmax. I have received nearly $800,000 in payments from Rodmax over the years. At no point did Castillo suggest that invoicing one of his many companies would alter the agreement from one he made personally with us, to an agreement between us and one of his shell companies.

26. Castillo did make a considerable amount of payments for the flights at issue in this case. In total, Castillo made 35 payments to Rajet and directed Rajet to provide invoices to five distinct companies (below) with regards to the flights at issue in this case. As shown, only one payment came from Lucamax, contributing around 6% of the total paid by Castillo.

| Date | Amount | Company |
|---|---|---|
| Wednesday, March 12, 2014 | $48,822.98 | LUCAMAX, S.A. DE C.V. |
| Thursday, May 15, 2014 | $58,000.00 | IMPULSORA INTERNACIONAL DE EQUIPOS, S.A. DE C.V. |
| Friday, June 20, 2014 | $29,000.00 | IMPULSORA INTERNACIONAL DE EQUIPOS, S.A. DE C.V. |
| Tuesday, June 24, 2014 | $11,600.00 | IMPULSORA INTERNACIONAL DE EQUIPOS, S.A. DE C.V. |
| Wednesday, July 9, 2014 | $35,346.62 | OPERADORA MISTLI, S.A. DE C.V. |
| Wednesday, September 24, 2014 | $15,509.20 | OPERADORA MISTLI, S.A. DE C.V. |
| Thursday, September 25, 2014 | $17,400.00 | OPERADORA MISTLI, S.A. DE C.V. |
| Monday, October 13, 2014 | $14,500.00 | OPERADORA MISTLI, S.A. DE C.V. |
| Wednesday, October 29, 2014 | $11,681.20 | OPERADORA MISTLI, S.A. DE C.V. |
| Monday, February 9, 2015 | $16,775.83 | OPERADORA MISTLI, S.A. DE C.V. |
| Wednesday, March 11, 2015 | $6,416.96 | OPERADORA MISTLI, S.A. DE C.V. |
| Wednesday, March 25, 2015 | $30,000.00 | OPERADORA MISTLI, S.A. DE C.V. |
| Thursday, April 9, 2015 | $25,000.00 | OPERADORA MISTLI, S.A. DE C.V. |
| Monday, April 20, 2015 | $20,000.00 | OPERADORA MISTLI, S.A. DE C.V. |
| Thursday, April 30, 2015 | $20,000.00 | CREATOR AVALANZED, S.A. DE C.V. |
| Friday, May 15, 2015 | $10,000.00 | CREATOR AVALANZED, S.A. DE C.V. |
| Tuesday, May 26, 2015 | $30,000.00 | CREATOR AVALANZED, S.A. DE C.V. |
| Friday, June 5, 2015 | $12,874.41 | CREATOR AVALANZED, S.A. DE C.V. |
| Thursday, July 16, 2015 | $25,401.66 | PLASMON, S.A. DE C.V. |
| Tuesday, August 4, 2015 | $24,824.83 | CREATOR AVALANZED, S.A. DE C.V. |
| Monday, October 19, 2015 | $12,198.17 | CREATOR AVALANZED, S.A. DE C.V. |
| Tuesday, November 10, 2015 | $17,763.05 | CREATOR AVALANZED, S.A. DE C.V. |
| Wednesday, December 30, 2015 | $46,494.05 | CREATOR AVALANZED, S.A. DE C.V. |
| Wednesday, December 30, 2015 | $6,056.20 | CREATOR AVALANZED, S.A. DE C.V. |
| Monday, January 25, 2016 | $27,132.62 | CREATOR AVALANZED, S.A. DE C.V. |
| Tuesday, February 9, 2016 | $10,697.53 | CREATOR AVALANZED, S.A. DE C.V. |
| Tuesday, February 9, 2016 | $15,972.90 | CREATOR AVALANZED, S.A. DE C.V. |
| Monday, February 22, 2016 | $27,690.39 | CREATOR AVALANZED, S.A. DE C.V. |
| Friday, February 26, 2016 | $56,003.27 | CREATOR AVALANZED, S.A. DE C.V. |
| Friday, February 26, 2016 | $16,512.55 | CREATOR AVALANZED, S.A. DE C.V. |
| Tuesday, March 15, 2016 | $16,883.24 | CREATOR AVALANZED, S.A. DE C.V. |
| Friday, April 1, 2016 | $17,307.23 | CREATOR AVALANZED, S.A. DE C.V. |
| Friday, April 15, 2016 | $28,755.46 | CREATOR AVALANZED, S.A. DE C.V. |
| Thursday, April 28, 2016 | $17,242.07 | CREATOR AVALANZED, S.A. DE C.V. |
| Monday, May 23, 2016 | $27,199.63 | CREATOR AVALANZED, S.A. DE C.V. |

27.     We emailed Castillo's assistant over 70 emails requesting payment of the overdue balance. Many of those emails included the account statement, listing Luis Carlos Castillo as the client. Castillo's assistant responded to nearly all of those emails, and in a majority of them made

some commitment to pay what Castillo owed. In no email did Castillo's assistant claim that Castillo did not owe the debt.

28.     During the last 15 months of providing Castillo flights, and the six months that followed the last flight, I spoke with Castillo frequently, up to three times per week. Castillo repeatedly confirmed his personal commitment to pay as agreed to. All of our phone conversations were done to one of his two McAllen, Texas phone numbers that I have for him. During all of our calls, Castillo never once denied the existence of our agreement or that he owed the debt as indicated from the account statements that were provided to him. At no point did Castillo claim that a third-party owed the debt instead of himself. At no point did he mention that an agreement, if any, was between one of his shell companies as opposed to himself.

29.     After he was arrested, he stopped answering my calls. The day before his arrest, he told me he would make a payment on his balance that week. I called him 5-10 times after his arrest and he never answered.

30.     Approximately 4-5 months after his release from prison, we visited his house. We were given a number by his gardener. We were sent to Home Depot, and then somewhere else.

31.     In 2017, I received a call assuring me that the balance would be paid.

32.     I first contacted attorneys Andres Sanchez and Andy Parker in July 2017 regarding this matter. Over the following month I met with them several times and had numerous discussions with them regarding the facts of this case. No one discussed suing in Mexico since it was clear that Castillo could not be brought to court in Mexico, and he was a pertinent witness in addition to being the sole defendant.

_____
Luis Alfredo Rayet Diaz
President and Owner
RAJET AEROSERVISIOS S.A. De C.V.

Executed on: 02-27-2019